**Timothy FERGUSON, Plaintiff–Appellant,**

v.

**Jo Anne BARNHART, Commissioner of Social Security, Defendant–Appellee.**

**No. 02–3514.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 2003.

Decided May 29, 2003.

Before COFFEY, MANION, andROVNER, Circuit Judges.

ORDER

Timothy Ferguson filed a *pro se* application for Supplemental Security Income benefits pursuant to §§ 1602 and 1614(a)(3)(A) of the Social Security Act (the "Act"), 42 U.S.C. §§ 1382 and 1382c, claiming that a combination of ailments rendered him unable to work as of January of 1991. The Social Security Administration ("SSA") denied his application, and Ferguson sought judicial review, arguing that his waiver of counsel before the administrative law judge ("ALJ") was invalid and that the ALJ's decision to deny benefits was not supported by substantial evidence. The district court affirmed the SSA's determination that Ferguson was not entitled to disability benefits. We reverse the judgment of the district court and remand Ferguson's claim for further proceedings consistent with this opinion.

*I. Background*

*A. Procedural history*

Ferguson filed his application for Social Security benefits on February 13, 1997, alleging a disability onset date of January 1, 1981. He contended that his disability arose from a number of ailments including diabetes, hypertension, gout, back pain, headaches, as well as hearing and vision impairments. After his claim was initially denied by the Commissioner, Ferguson was granted a hearing before an ALJ and represented himself at the August 19, 1998 hearing.

After the August hearing, the ALJ denied Ferguson's application for benefits, and Ferguson filed a petition before the Appeals Council. The Appeals Council subsequently remanded the case, finding

that the ALJ had obtained additional medical records after the administrative hearing and that the ALJ had not fully advised Ferguson of his right to a supplemental hearing to address the new records. The Appeals Council also noted that, upon remand, the ALJ needed to more adequately assess Ferguson's mental impairments and, in particular, address evidence that Ferguson was diagnosed as borderline intellectual functioning.

The ALJ conducted a subsequent hearing on May 17, 2000, and Ferguson again appeared *pro se*. After the hearing, on June 2, 2000, the ALJ entered another order denying benefits. The Appeals Council subsequently denied review, rendering the ALJ's order the final decision of the Administration for purposes of judicial review. Ferguson filed the instant action challenging the denial of his benefits, and the district court affirmed the decision of the Secretary, finding that Ferguson was not disabled under the meaning of the Act.

### B. August 19, 1998 hearing

#### i. Ferguson's "waiver" of counsel

Ferguson, who was 48 years old at the time of the August 19, 1998 hearing, appeared at the hearing without an attorney. The ALJ informed him that he was "entitled to a reasonable opportunity to make ... arrangements" to be represented by an attorney and asked him if he wanted a continuance to "see if you can get legal aid or some attorney to represent you." (R. at 199–200.[1]) Ferguson replied that he "d[id]n't have no [sic] money to do anything," at which time the ALJ remarked that "there are legal aid groups that will at times represent individuals ... [a]nd if legal would agree to represent you there would be no cost to you." (*Id.* at 200.) Ferguson then told the ALJ, "Well, if you

can give me some—whoever because I don't, I don't live here." (*Id.*) Thereafter, the following exchange occurred:

ALJ: "All right. Well, we would give you a list. . . ."

Ferguson: "Okay."

ALJ: ". . . and then it would be up to you to call them . . ."

Ferguson: "Um-hum."

ALJ: ". . . and see if they would agree to represent you."

Ferguson: "Okay. Okay, well, what are you telling me? That I'm not capable of getting it?"

ALJ: "No, not at all. It's up to you. You can ... you would have to call them."

Ferguson: "Well, I mean, I don't understand. You know."

ALJ: "All right. Let me go and try to . . ."

Ferguson: "Okay."

ALJ: ". . . go over it again. The hearing is designed so the person doesn't have to have a representative."

Ferguson: "Okay."

ALJ: "On the other hand some individuals feel that their interests are better served if the[y] are represented."

Ferguson: "Um-hum."

ALJ: "We would want to make sure you had a reasonable time to make those arrangements if that is what you wanted to do."

Ferguson: "Um-hum."

ALJ: "And that is why we had mailed, along with our acknowledgment letter, the telephone numbers and addresses of attorney referral groups and legal aid groups."

Ferguson: "All right. I don't -"

---

1. References to the record will herein be de-   noted "R. __."

ALJ: "So if you came to the hearing unaware of that and if you would like a continuance-"

Ferguson: "Um-hum."

ALJ: "... to call legal aid and these attorney referral groups to see if they'd represent you, I would grant you such a continuance."

Ferguson: "I figured I don't ... shouldn't have to have that because I don't have, you know, I'm here."

ALJ: "All right, sir. If you'd like to waive that we can go ahead with the hearing at this time."

Ferguson: "Okay."

(R. at 200–01.)

Ferguson having "waived" the opportunity to obtain counsel, the ALJ thereafter continued with the hearing, and Ferguson represented himself *pro se.*

### ii. Evidence of disability

After the oath was administered, Ferguson testified that he had not been gainfully employed since January 1981 (his alleged disability onset date). He claimed to suffer from gout, recurring headaches, and also to have problems seeing, breathing, walking, sitting and standing. At the time, he believed he could only walk a block or so, stand for a half an hour to an hour, and that he could only lift 20 to 25 lbs. Ferguson claimed to weigh around 155 lbs., and noted that he used to weigh 172 (5 to 10 years prior).

Ferguson stated that, for financial reasons, he did not (at least at the time) have a treating physician; instead, whenever he had a health problem, Ferguson went to a hospital emergency room. He claimed that he had been to Silver Cross Hospital

around a month prior to "have fluid drained on my—off my knees. And it's, it's bothering me. Been bothering me for a while. I can't stand up too long. I can't sit too long because it locks. I been taking pills for it." (*Id.* at 204.)

Ferguson reported that he was a widower, and that, at the time of the hearing, he was "liv[ing] with [a] lady," but stated that he "d[id]n't do nothing [sic] around the house." (*Id.* at 209.) He did go to the store "sometime," but he claimed that he did not do anything socially or at church. According to Ferguson, he suffered from memory problems: "Sometimes I forgets and I have to wait for maybe a day or so to think about what I did or whatever." (*Id.* at 210.) He admitted that he "drinks" and stated that whenever he could get beer, he drank it "all the time." (*Id.*)

At a number of points during the hearing, Ferguson appeared somewhat confused or at least unprepared to represent himself. For instance, when the ALJ asked Ferguson if he had looked over his exhibits and medical records, Ferguson replied, "I glanced over them but I couldn't, I couldn't really read them that good because I'm—I (INAUDIBLE) any glasses." (*Id.* at 203.) [2]

### C. May 17, 2000 hearing

At the subsequent hearing (May 17, 2000), held by the ALJ upon remand of the case by the Appeals Council, Mr. Ferguson again appeared unrepresented by counsel. Ferguson testified that he was having trouble reading because his "eyes are bad since, you know, I got sugar and everything." (R. at 218) (referring to diabetes). He stated that his diabetes had been diag-

---

**2.** Notably, rather than suggesting that Ferguson get some sort of assistance in reviewing the records, the ALJ asked, "Well, when you did look at them was there anything in here that appeared inaccurate or that you'd object to being received into the record as evidence?", to which Ferguson replied, "No." (R. at 203.)

nosed a year and two months prior to the hearing, and that he was taking medicine for his condition. The ALJ listed a number of prescriptions that Ferguson was then taking, including Humulin,[3] but he never did ask whether his diabetic condition was being controlled by medication.

In addition to his diabetes, Ferguson again complained about his gout and back problems. According to Ferguson, his ability to sit, stand and walk had declined; he could only walk half a block or stand for five minutes (used to be he could walk a block or stand for a half an hour to an hour), could only lift ten to fifteen pounds (used to be 20 to 25 pounds), and Ferguson could not bend and stoop. He noted that, "ever since [he] had sugar [diabetes]," he has had "no strength in there down in my knees." (*Id.* at 223.) When the ALJ asked him about his gout, he stated that he "d[id]n't know" when his last attack was, but, upon prompting from the ALJ asking, "Has it been some time?", Ferguson replied, "Yeah, it's been sometime. I[t] just comes and goes since I been taking the medicine." (*Id.* at 224.) He testified that his hypertension was "somewhat" controlled by his medicine, but that he still experienced chest pains "every now and then." (*Id.* at 227). Ferguson also reported that his weight had dropped from 155 pounds (on August 19, 1998) to 150 pounds at the time of the hearing, stating that his weigh loss was "from the diabetes." (*Id.* at 224) He also reported that he had joined an alcoholic recovery group and that he had not had a drink for some year and two months.

As far as daily activities were concerned, Ferguson testified that he had "no problems" getting his groceries, and that he "go[es] to church sometimes with my sis-ter...." (*Id.* at 226.) When asked whether his situation was stable or worsening, Ferguson remarked, "well, I ain't getting no better...." (*Id.*)

The ALJ called a psychiatrist, Dr. Marjorie Ardon, to testify regarding Ferguson's mental impairments. Dr. Ardon had reviewed the record and witnessed Mr. Ferguson's testimony during the hearing. According to Ardon, "if you go by [Ferguson's] testimony alone since there's no documentation [of a mental impairment], then, there's no impairment." (*Id.* at 232.) Dr. Ardon went on to state that, according to evidence in the record, Ferguson exhibited antisocial behavior personality disorder, as well as substance abuse (alcohol), but opined that such restrictions would only be "slight" at present. When the ALJ noted that in 1994 Ferguson had been found to be "mental[ly] retard[ed]" (*id.* at 235), with a full-scale IQ score of 79, Dr. Ardon stated that she would "question" those results because "alcohol was present" at that point, but admitted that those scores would place him in the range of borderline intellectual functioning. (*Id.* at 237) Ardon further noted that Ferguson himself "denies any psychosocial problems...." (*Id.* at 242)

When the ALJ finished questioning Dr. Ardon, he asked Ferguson, "is there anything you can think of that might be important in providing the complete and accurate assessment of your situation that we haven't discussed?", and Ferguson replied, "Well, not off hands [sic] you know. And, and half of [Dr. Ardon's testimony] I don't even understand, you know, what you asked her and the stuff like that. I don't even understand it, you know." (*Id.* at 241.)

---

**3.** The record supports that Ferguson was also taking Lasix, Celebrex, Pepsid, Ferrous Sulfate, Colchicine, and Localane.

## II. Analysis

Under the Social Security Act, a claimant is entitled to benefits if he is "disabled," or, in other words, if he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continual period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a social security claimant is "disabled," the ALJ applies a five-step framework that begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). In this case, Ferguson had not been gainfully employed, so the ALJ proceeded to the next question, and considered whether, based upon the medical evidence, Ferguson suffered from a "severe impairment." 20 C.F.R. § 404.1520(c). The ALJ found that Ferguson's combined impairments-diabetes, mental impairments (antisocial behavior and history of alcoholism), moderate visual and hearing impairments, as well as back pain and gout-were "severe," but that (proceeding to the third step in the sequential evaluation process) they did not qualify as any of the Listed Impairments set forth at Appendix 1, Subpart P, Regulations No. 4, 20 C.F.R. §§ 416.925(a) and 416.920(d). Finally, at the last step of the sequential evaluation process,[4] the ALJ concluded that Ferguson retained the residual functional capacity to perform a significant range of medium work.

Judicial review of a decision to deny a claimant disability benefits is limited to determining whether the ALJ "applied the correct legal standard, [and whether his decision] is supported by substantial evidence" in the record. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir.2000). Substantial evidence is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir.2000) (internal quotations omitted).

### A. Ferguson's waiver of representation

A claimant has a statutory right to counsel at an administrative hearing regarding disability benefits. 42 U.S.C. § 406, 20 C.F.R. 404.1700. "If properly informed of the right [to attorney representation at a social security hearing], the claimant may waive it." *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994). In all cases, for the waiver to be valid, the ALJ must "explain to the *pro se* claimant: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Id.* (citing *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir. 1991)).

■ In this case, the ALJ's explanation of the right to counsel was woefully inadequate. Although the ALJ notified Ferguson that he was "entitled to a reasonable opportunity to make . . . arrangements" to be represented by an attorney (R. at 199–200), the ALJ did not fully explain to Mr. Ferguson that legal representation was available at no cost to him-this despite the fact that Ferguson expressed reservation at the prospect of securing counsel precisely because he "d[id]n't have no [sic]

---

4. Typically, there is an intermediary "fourth" step in the evaluation process, at which point the ALJ considers whether a claimant is capable of performing past relevant work. Because the claimant in this case "ha[d] no documented work history within the relevant 15–year period," (R. at 16), the ALJ proceeded directly to the final (fifth) step to determine Ferguson's residual functional capacity to perform work.

money to do anything." (*Id.* at 200.) The ALJ did make a brief reference to the existence of "legal aid groups" that "will at times represent individuals" for free, but made *no* effort to explain another important alternative-namely, the possibility of securing counsel through a contingency fee arrangement. Finally, the ALJ's explanation was insufficient insofar as he failed to inform Ferguson that attorneys' fees would be subject to a cap (25 percent of past due benefits), thereby ignoring one of the express requirements under *Binion.*

The fact that the ALJ gave short shrift to the importance of counsel, and failed to explain adequately the availability of (free) legal representation is particularly troubling in this case, considering the record evidence that Ferguson is mentally impaired. After all, Ferguson's overall IQ score was an 79 (borderline intellectual functioning). Moreover, during a 1997 medical examination, Ferguson could not articulate "any difference between [a] tree and [a] bush," (R. at 156), and could not even name five large cities in the United States (he listed "Chicago, New York, California and Mississippi" (*id.* at 136)). For a person such as Ferguson, who is unable to properly respond to simple inquiries such at these, it seems to us particularly important that his right to be represented by counsel be explained adequately and clearly by the ALJ. *See, e.g., Smith v. Secretary of Health, Educ. and Welfare,* 587 F.2d 857, 860 (7th Cir.1978) (discuss-ing the ALJ's duty to take "greater care" and go into "greater detail" regarding the availability of counsel when addressing a claimant who suffers from mental illness). From a reading of the transcript, we are convinced that Ferguson failed to understand part (if not most) of the (deficient) explanation of the availability and method of obtaining legal counsel that was given by the ALJ.

In any event, the ALJ failed to make the requisite disclosures under *Binion.*[5] Thus, Ferguson's waiver of representation was clearly invalid.

## B. Full and fair development of the record

The SSA argues that, the invalidity of Ferguson's waiver notwithstanding, this Court should affirm the ALJ's decision to deny benefits because the ALJ "fully and fairly" developed the record. As this Court stated in *Binion,* "[a] claimant is not entitled to a remand based on inadequate notice of the right to representation unless the ALJ did not develop a full and fair record." *Binion,* 13 F.3d at 245 (citing *Smith,* 587 F.2d at 860). We went on to note, in *Binion,* that "[t]he ALJ's duty to develop the record fully and fairly where the claimant proceeds without counsel is met if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Id.* Moreover, we "gave teeth" to this requirement, by hold-

---

**5.** There is evidence in the record that, prior to the August 19, 1998 hearing, the Administration sent Ferguson a letter of notice informing him that he could "have a friend, lawyer or someone else help [him with his case]. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal." (R. at 35.)

It is unclear whether Ferguson ever received this letter, however. At the hearing, when the ALJ asked Ferguson if he had re-ceived the notice, Ferguson replied that he could not recall the letter "off hand." (R. 199.) Moreover, we have little reason to believe that Ferguson understood the contents of the communication, if in fact he did receive it. In any case, even if the written notice was received, such notice was inadequate under *Binion,* because it did not discuss the way in which attorney representation would be of help to Ferguson, nor did it explain the 25 percent cap on attorneys' fees.

ing that "if the ALJ does not obtain a valid waiver, the burden is on the Secretary to show the ALJ adequately developed the record." *Id.*

To determine whether an ALJ's development of the record qualifies as "full and fair," we have, in the past, considered a number of factors, including: (1) whether the ALJ obtained all of the claimant's medical and treatment records; (2) whether the ALJ elicited detailed testimony from the claimant at the hearing (probing into relevant areas, including medical evidence on the record, medications, pain, daily activities, the nature of all physical and mental limitations, etc.), and (3) whether the ALJ heard testimony from examining or treating physicians. *See, e.g., Binion,* 13 F.3d at 245 (outlining the ALJ's actions in *Binion,* which *did* qualify as "full and fair development" of the record). Although there is no hard and fast standard that delineates what is "full and fair" development of the record, " 'a significant omission is usually required before this court will find that the Secretary failed to assist *pro se* claimants in developing the record fully and fairly.' " *Nelson v. Apfel,* 131 F.3d 1228, 1235 (7th Cir. 1997). We are convinced that the ALJ's development of the record in this case was not "full and fair," and that it did contain significant omissions.

■ As an initial matter, a review of the transcript suggests that, during the hearing, the ALJ failed to do an adequate job of gleaning important information regarding Ferguson's health problems. In fact, the ALJ solicited hardly any information from Ferguson regarding what appeared to be two of his most serious limitations-gout and diabetes. At the May 17, 2000 hearing, the only question the ALJ asked Ferguson regarding his gout was how long it had been since his last attack. When Ferguson replied that he "didn't know,"

the ALJ said, "Has it been some time?" and Ferguson replied, "Yeah, it's been sometime. I[t] just comes and goes...." (R. at 224.) This answer apparently satisfied the ALJ, because he did not make any further inquiry into how long of a period of time qualified as "some time," nor did he ask how often Ferguson's gout "comes and goes." And, although there was evidence in the record that on at least one occasion Ferguson had gone to the emergency room to have fluid drained from his knee, the ALJ made no effort to determine the severity of Ferguson's gout attacks.

Similarly, the ALJ never asked *any* questions about the extent of Ferguson's diabetes or its effects on his daily life-this in spite of the fact that Ferguson made brief references (throughout his testimony) to weight loss, physical weakness, and vision problems, which he apparently attributed to the disease. (*See* R. at 218 (vision problems), 223 (muscle weakness), 224 (weight loss)). The ALJ did inquire as to whether Ferguson was "taking [anything] for [his diabetes]" (*id.* at 219), but after Ferguson stated that he was taking a prescription for the illness, the ALJ posed no further questions to determine whether the medication was actually controlling his diabetes.

Another glaring deficiency in the ALJ's development of the record was his failure to secure certain treatment records containing evidence that Ferguson experienced complications from his diabetes (peripheral neuropathy and vision problems). These medical records were eventually submitted by Ferguson's appellate counsel to the district court and are now part of the record on appeal, but they were never considered by the ALJ. And, while the Secretary is correct in noting that Ferguson declined a number of opportunities to submit any additional medical evidence to support his claim (*See, e.g.,* R. at 242)

("[I]s there anything else you can think of [adding] before I close the hearing?" "Not off hand."), this hardly seems a sufficient defense in this case, considering that Ferguson is borderline intellectual functioning, and, as evidenced by a number of his statements to the ALJ, may not even have had the capacity to understand everything that was going on at his hearing.[6]

We hasten to add that we by no means seek to broaden the responsibilities owed by an ALJ to a *pro se* social security claimant beyond that which has already been established in the case law. But we do believe that, in a case such as this, where a *pro se* claimant's mental capacity is in question, and where the claimant never entered a valid waiver of counsel, it is incumbent upon the ALJ to make a detailed inquiry into the extent of the claimant's alleged illnesses, and to obtain the relevant treatment records. Here, the ALJ failed on both accounts and, as a result, there were significant omissions in the record he developed that warrant a remand.

The judgment of the district court is REVERSED and the cause REMANDED to the SSA for further proceedings consistent with this opinion. Additionally, prior to rehearing, Ferguson's appellate counsel

(or whomever Ferguson chooses to represent him during administrative hearings) must be listed as the attorney of record.

---

6. A number of Ferguson's responses to the ALJ's inquiries reflected a lack of comprehension or misunderstanding of the question posed to him. For example, when the ALJ asked Ferguson if he had "ha[d] an opportunity before entering the hearing room to review the record which now includes documents that were not there at the time of the prior decision," Ferguson replied, "I brought some papers in that (INAUDIBLE)," at which point the ALJ jumped in and was forced to repeat, "but did you have a ... chance to review the proposed exhibit before the start of the hearing?" (R. at 217.) Also, when asked the straight-forward question, "did you ever use drugs in the past," Ferguson replied, "I don't understand." (R. at 222.) Finally, as noted above, when asked if there was "any-

thing [else] [he] c[ould] think of that might be important [to the proceeding]," Ferguson replied, "Well, not off hands, you know. And, and *half of it I don't even understand, you know, when you asked [the expert] and the stuff like that. I don't even understand it, you know.*" (R. 241) (emphasis added). Having failed to obtain from Ferguson a valid waiver of counsel, it is difficult to ascertain why the ALJ proceeded with the hearing when Ferguson expressly stated that he did not understand the expert witness's testimony.

